*E-Filed 06/07/2010*

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

RICHARD FALCONE,

Plaintiff,

v.

DLA PIPER US LLP PROFIT SHARING AND 401(K) SAVINGS PLAN COMMITTEE, et al.,

Defendants.

_______________________________________/

No. C 09-5555 RS

**ORDER DENYING MOTION TO DISMISS**

I. INTRODUCTION

In his Complaint, Richard Falcone levies a claim for breach of fiduciary duty under the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. § 1001, *et seq*. Specifically, he avers he elected to invest assets held on his behalf in the law firm DLA Piper's investment plan (the "Plan"), that the Plan's fiduciaries failed to follow his investment instructions, and that this failure violated the fiduciaries' duties under ERISA's Section 502(a)(2). Defendants—the DLA Piper Profit Sharing and 401(K) Savings Plan Committee (the "Committee"); the custodial trustee, Bank of Oklahoma; and two individuals, Carol Buss and Lawrence Robbins—move to dismiss Falcone's Complaint for failure to state a claim for relief under Rule 12(b)(6) of the Federal



United States District Court
For the Northern District of California

Rules of Civil Procedure. Because Falcone has alleged sufficient facts to support a plausible claim for relief under Section 502(a)(2) against all defendants, their motion must be denied.

## II. RELEVANT FACTS

Falcone became a participant of the Plan in 2006 when he joined the DLA Piper law firm. As the defendants characterize it, the Plan is an "ERISA employee pension benefit plan established under Section 401(k) of the Internal Revenue Code and [is] a defined contribution or individual account plan." (Defs.' Opp'n at 2:23-25.) Falcone contends that the Plan provides participants with a right, subject to certain discrete qualifications, to direct the investment of Plan assets allocated to their individual account balances into any of the investment options offered by the Plan. Falcone insists that when he became a participant in DLA Piper's Plan, he affirmatively elected on at least two occasions to invest assets held on his behalf in cash funds.

Prior to his employment with DLA Piper, Falcone was employed by the Littler Mendelson firm and participated in that firm's retirement plan. In September of 2006, he requested a rollover of his Littler plan account balance to the DLA Plan. Falcone contends he affirmatively requested the cash option when he first joined the DLA Plan and again when he requested this rollover. Following the rollover, his entire account balance was invested in cash funds until July of 2008. He explains that in October of 2008, he discovered that the Plan's administrators had—without his consent and apparently contrary to his instructions—transferred his entire account balance from cash funds to a Vanguard Target Retirement Fund (the "Vanguard fund") in July of 2008. Falcone contends he inquired into the reason for the transfer, and learned from the Plan's administrators that the change was made pursuant to notices purportedly sent to his address on May 15 and June 11 of 2008. Falcone avers that he received neither notice but requested copies once he learned of the transfer. According to the averments in Falcone's Complaint, the May 15 notice stated that participants invested in a cash fund—like Falcone—needed proactively to assert any desire to maintain the cash investment. Falcone claims the June 11 notice, in contrast, stated that, "[i]f you have previously made an affirmative investment election, your contributions will continue to be invested per your investment elections." Defendants suggest a different version of the purported

United States District Court
For the Northern District of California

June 11 notice was actually sent to Falcone, which was an exact copy of the May 11 notice (except, of course, for the date). Accordingly, they insist that *all* participants who invested in cash—including those who made an affirmative election to do so—were required to reassert a desire to maintain these cash investments. Otherwise, the administrator would reinvest these assets into the Plan's new default fund (the Vanguard fund).

In his Complaint, Falcone also contends that a second, more general notice sent from the Plan Administrator to all participants outlines the Plan's general procedure for making investment directions. According to Falcone, this notice states that "[y]our most recent instructions will remain in effect until you submit new instructions according to these rules." It then explains that "the Plan Administrator . . . is responsible for providing you this information and carrying out the Plan's procedures for investment direction." The notice provides that "the Trustee will automatically invest your account balance in the default fund selected by the Plan Administrator" where a participant fails to provide investment instructions. Finally, it indicates that the Administrator can also establish *new* procedures as necessity arises, but must provide notice of these procedures in writing to participants.

The parties agree that, prior to July of 2008, cash funds like those in which Falcone's assets were invested served as the Plan's default fund. In the spring and summer of 2008, the Plan Committee changed the Plan's default fund to the Vanguard fund in light of new federal regulations delineating which funds can qualify as Qualified Default Investment Alternatives (the "QDIA regulations") under ERISA. Defendants dispute that Falcone ever made *any* affirmative election to invest in cash funds. It is their position that his cash investment in the first instance reflected the default status of those funds. They insist, however, that even if he had elected to invest in cash funds, this was not enough to prevent the automatic transfer. According to the defendants, the Plan's terms gave the Administrator discretion to transfer his assets, Falcone's wishes notwithstanding.

Falcone insists he requested that Bank of Oklahoma return the balance of his assets to cash funds. That entity did so. As a result of the purportedly unauthorized transfer of funds allocated to

United States District Court
For the Northern District of California

his account, he avers that the Plan sustained a loss of approximately $225,000. In late January of 2009, Falcone states he notified defendant Buss, the party he understood acted as the Senior Plan Administrator, to request restoration to the Plan of all losses associated with the transfer. Defendant Robbins responded to this letter on behalf of the Committee and denied Falcone's request.

## III. LEGAL STANDARD

When considering a motion to dismiss under Rule 12(b)(6), a court accepts a plaintiff's factual allegations as true and construes the complaint in the light most favorable to the plaintiff. *Jenkins v. McKeithen*, 395 U.S. 411, 421 (1969). Dismissal is appropriate where a complaint lacks "sufficient facts to support a cognizable legal theory." *Mendiondo v. Centinela Hosp. Med. Ctr.*, 521 F.3d 1097, 1104 (9th Cir. 2008). When ruling on a Rule 12(b)(6) motion, a district court generally may not consider material beyond the pleadings. *Fort Vancouver Plywood Co. v. United States*, 747 F.2d 547, 552 (9th Cir. 1984). Material which is properly submitted as part of the complaint, however, may be considered. *Amfac Mtg. Corp. v. Arizona Mall of Tempe*, 583 F.2d 426, 429-30 (9th Cir. 1978).

To state a claim for relief, Rule 8(a)(2) demands that a pleading include a "short and plain statement of the claim showing that the pleader is entitled to relief." The Supreme Court has instructed that this mandate does not require "detailed factual allegations," but "demands more than an unadorned, the-defendant-harmed-me accusation" or "naked assertion[s] devoid of further factual enhancement." *Ashcroft v. Iqbal*, 129 S. Ct. 1937, 1949 (2009) (internal quotation marks omitted). "A pleading that offers 'labels and conclusions' or a 'formulaic recitation of the elements of a cause of action will not do.'" *Id.* (*quoting Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007)). The tenet that allegations are construed in a light favorable to the plaintiff does not apply, however, to bare legal conclusions. *Twombly*, 550 U.S. at 555 ("Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice."). Even where the plaintiff alleges something more than a bare legal conclusion, *Twombly* requires a statement of a plausible claim for relief. *Id.* at 544. Weighing a claim's plausibility is ordinarily a task well-suited to the

district court but, where the well-pleaded facts do not permit the court to infer more than a mere *possibility* of misconduct, the complaint has not shown the pleader is entitled to relief. *Iqbal*, 129 S. Ct. at 1950.

IV. DISCUSSION

A. The Claim for Breach of Fiduciary Duty Against the Institutional Defendants

The provision of ERISA upon which Falcone relies, Section 502(a)(2), provides for suits to enforce the liability-creating provisions of Section 409 of that Act, concerning breaches of fiduciary duties that harm investment plans. An ERISA fiduciary must dispatch his or her duties with respect to a plan "in accordance with the documents and instruments governing the plan," at least insofar as such documents are consistent with the Act. 29 U.S.C. § 1104(a)(1)(D).

In relevant part, the DLA Plan provides:

> Subject to such limitations as may be required by law, imposed by the Firm or the Administrator, or contained elsewhere in the Plan document, each Participant may direct the investment of his or her Account among any one or more investment options as the Administrator makes available from time to time . . . . The Administrator will establish procedures, including time restrictions, for designating and changing investment options.

(Pl.'s Opp'n at 5:4-7.) The Plan also provides that where a Participant fails to designate an investment allocation, "the Participant's Account will be invested in a fund or funds selected by the Administrator, in its discretion." (*Id.* at 10-11.) Plaintiff insists he affirmatively elected to invest his Account in cash funds. That is, he claims his was not the situation contemplated by the just-quoted language. Insofar as defendants rely on this provision to assert that the transfer was appropriate because Falcone had no prior election history on file, their motion must fail. Similarly, defendants' reliance on their version of the second notice (dated June 11, 2008) for the proposition that even participants who *had* elected to invest in cash funds were required to reaffirm this choice cannot carry weight at this phase of the litigation; the pleading standard defers to plaintiff's characterization of that notice.

Defendants, however, propose an alternative argument in support of their motion to dismiss. They suggest that, even crediting Falcone's assertion that, first, he did affirmatively elect to invest

United States District Court
For the Northern District of California

in cash funds and, second, both the June 11 notice and the participant notice stated that the Plan Administrator would honor prior investment elections, they were still entitled under the Plan's terms to make the transfer. More simply, defendants insist that the Plan imposed no obligation to follow Falcone's affirmative investment instructions. Making all reasonable inferences from that document, the Plan's language does not necessarily support defendants' argument.

It is clear from even the portions of the Plan on which Falcone relies that the Committee can, in certain contexts, limit a participant's ability to direct the investment of his or her account. As quoted above, participants are entitled to direct the assets of their accounts, subject to "such limitations as may be required by law, imposed by the Firm or the Administrator . . . ." Defendants suggest the U.S. Department of Labor's QDIA regulations operated as such a "limitation as may be required by law." As defendants explain, the Department published final QDIA regulations in October of 2007 that announced the types of investments that could constitute qualified default investment alternatives for which a plan sponsor could receive certain protections under ERISA. Prior to the issuance of these regulations, the DLA Plan treated cash funds as the default alternative. Apparently, the new regulations provided that cash funds could only function as the QDIA in limited circumstances. It was to comply with these regulations, defendants assert, that the Committee determined to transfer those assets invested by default in cash funds into the Vanguard alternative.

While this rationale explains the purpose of the transfer, it is not at all clear that these regulations removed Falcone's ability, under the plain language of the Plan, to direct the investment of his account assets. He contends his assets were not invested in cash funds by default, and reasons that even if the QDIA regulations did require that the Plan retool its default program, these regulations in no way implicated his assets. Insofar as defendants assert that the Committee or its administrators were in any case free to adopt changes without Falcone's consent, he argues in his Complaint that two documents crafted by the administrators demonstrate that this is not true.[1] The

[1] Falcone also points to a general Plan provision for the proposition that the Plan was expressly designed to function as a participant-directed account plan. The relevant provision does indeed state that "[t]he Plan is intended to be a participant-directed account plan under ERISA section 404(c)

Plan expressly provides that the administrators will propound procedures for "designating or changing investment options." The two documents he highlights outline such procedures: he points to the version of the June 11 notice he eventually received and a general notice outlining procedures for directing investments under the Plan. Both state that the administrator will adhere to prior investment instructions or provide written notice of any change in this procedure. Accepting plaintiff's factual averments as true, this means the administrators provided that they would only unilaterally transfer the assets of those parties who never made an affirmative election. The latter document did not of course limit the administrator to this procedure for all time or in all circumstances, but did provide that participants would receive notice of any changes to the procedure in writing. Falcone insists he never received any notice of a change in the general rule affording him the right to direct his account assets.

Defendants argue neither document binds the administrator's actions because neither is a "controlling" or "governing" document. They argue that the notices do not create any possible obligation under the Plan, because they are "not part of the Plan document and communications between a Plan Administrator and a participant cannot amend or alter the terms of the Plan." (Defs.' Mot. at 13:11-13.) Falcone does not question the validity of this argument. He points out that he does not actually seek to amend or alter the Plan but relies instead on the notices simply as a *consistent* interpretation of the Plan's meaning. The Plan expressly states that the Administrator will develop enforcement and investment procedures consistent with the Plan to enable participants to make investment directives. The notices accordingly explain the procedure by which the administrator implements the Plan. Accordingly, Falcone has stated a plausible claim that the administrators were obligated to follow his affirmative investment instructions and, when they failed

---

and Department of Labor Regulation section [29 CFR 2550.404c-1] . . . . This means that after you instruct the Plan's fiduciaries about how to invest your account, the Plan's fiduciaries under most circumstances will not be liable for any losses which are the direct and necessary result of your investment instructions." That regulation also provides that section 404(c) plans must by definition "[p]rovide[] an opportunity for a participant or beneficiary to exercise control over assets in his individual account." Accordingly, Falcone points out that defendants' characterization of the Plan as supplying administrators with complete discretion to ignore affirmative investment instructions is quite inconsistent with the Plan's express assertion that it is designed to comply with section 404(c).

to do so, breached a fiduciary duty. Falcone has adequately pleaded that the Plan Committee was responsible for the transfer and that the Bank of Oklahoma, as trustee, implemented the allegedly improper transfer.

B. The Individual Defendants

The individual defendants, Buss and Robins, move to dismiss Falcone's fiduciary breach claim as alleged against them. They insist he has omitted crucial elements requisite to this claim. As the Supreme Court has instructed, the threshold question in a case alleging breach of the ERISA fiduciary duty is "not whether the actions of some person employed to provide services under a plan adversely affected a plan beneficiary's interest, but whether that person was acting as a fiduciary (that is, was performing a fiduciary function) when taking the action subject to the complaint." *Pegram v. Herdrich*, 530 U.S. 211, 226 (2000). *See* 29 U.S.C. § 3(21)(A) (a person is a fiduciary to the extent he exercises discretionary authority or discretionary control over the management and disposition of Plan assets, renders investment advice for a fee, or has any discretionary authority or discretionary responsibility in the administration of the Plan). Specifically, Buss and Robins argue Falcone has not pleaded that either party was charged with the duty to follow Falcone's (alleged) affirmative investment directions or that either acted in a fiduciary capacity when he or she ignored his election decision.

Falcone has adequately alleged that both Buss and Robins acted as fiduciaries with respect to his claim. In his Complaint, he avers that both parties were either members of the Plan Committee or were delegated Committee responsibilities. He points out that the Plan designates the Committee as the Plan's administrator. Moreover, the Committee has "responsibility and authority for administering the Plan in all its details." (Compl. ¶ 7.) The transfer of assets to a new default fund, Falcone argues, is an example of such administration. He suggests that any action taken with respect to Plan assets is within the Committee's fiduciary responsibility: either the Committee or its members therefore made the transfer or it delegated authority to the person or entity that did. In either case, Falcone argues, the Committee must comply with its fiduciary responsibilities or ensure that its delegee does.

Falcone alleges that Buss held the title of Senior Plan Administrator and was a Committee member. He avers that she responded to his inquiries regarding the investment of his Plan account and notes that she is the person to whom participants must direct their requests for review of denied claims. Falcone directed inquiries regarding his account to Buss and claims that in responding, she represented that she did so on behalf of the Committee. As to Robins, Falcone alleges that when he responded to Falcone's request that losses to his Plan account be restored, Robbins "purported to make determinations about Plaintiff's rights under the Plan, a function which is within the Plan Committee's authority under the Plan." (Compl. ¶ 10.) In his letter to Falcone declining to restore the losses, Robins indicated that the letter was sent from Robins "on behalf of the Plan Committee."

Bus and Robins insist Falcone must submit direct evidence that each personally made the decision to transfer Falcone's assets to satisfy Rule 8(a)(2)'s pleading standard. This overstates the liberal pleading standard Rule 8 represents, even under the Supreme Court's increasingly demanding interpretations in *Twombly* and *Iqbal*. Falcone alleges Buss was a committee member—indeed, the preeminent member—and the person to whom he was meant to direct investment related inquiries. When he did so as to his account, she replied in a manner indicative of some discretionary authority or control over his account. It is not clear how a plaintiff would ever have access to more direct evidence of precisely which individual actually made a transfer decision like the one at issue. As to Robins, the letter denying Falcone's request to reinstate the losses resulting from the transfer is sufficiently connected to the alleged breach; Robins' insistence that Falcone only connects him to the breach after the transfer took place ignores the possibility that the refusal to redress the resulting losses constitutes part of the underlying breach. Accordingly, defendants' motion to dismiss the Complaint as it applies to Bus and Robins must be denied.

C. Availability of a Section 502(a)(2) in Light of Section 502(a)(1)(B)

Finally, defendants suggest Falcone mistakenly grounds his breach claim under Section 502(a)(2). A Section 502(a)(2) claim, as the plain language of the statute reflects, is designed to redress harm to an investment plan. The provision authorizes the Secretary of Labor as well as plan participants, beneficiaries, and fiduciaries, to bring actions on behalf of a plan to recover for

violations of the obligations defined in Section 409(a). Section 502(a)(1)(B), by contrast, addresses the improper denial of *individual* benefits. Because Falcone's claim focuses on plan funds allocated to his individual account, defendants argue he may only bring a claim for the denial of individual benefits. In *LaRue v. DeWolff, Boberg & Associates, Inc.*, an individual plaintiff alleged that a plan administrator failed to follow his affirmative investment instructions and brought a Section 502(a)(2) claim seeking reimbursement of those losses sustained because of the error. 552 U.S. 248 (2008). The Supreme Court held that "[w]hether a fiduciary breach diminishes plan assets payable to all participants and beneficiaries, or only to persons tied to particular individual accounts, it creates the kind of harms that concerned the draftsmen of [Section] 409." *Id.* at 256. The Court insisted that "although [Section] 502(a)(2) does not provide a remedy for individual injuries distinct from plan injuries, that provision does authorize recovery for fiduciary breaches that impair the value of plan assets in [a] participant's individual account." *Id.* Falcone insists his claim and the recovery he seeks is functionally identical to the one addressed in *LaRue*. While he claims the breach resulted in losses approximating $225,000, he explains that these are Plan funds and not individual benefits.

Defendants rely completely on the concurrence in *LaRue* authored by Chief Justice Roberts. There, the Chief Justice reasoned that, "[i]t is at least arguable that a claim of this nature properly lies only under § 502(a)(1)(B) of ERISA." *Id.* at 257. He suggested that where it is clear a plaintiff can recover under the individual benefits section, he might not also have a viable claim on behalf of the plan. Falcone counters that his claim is inherently *not* one for benefits—he notes that he is not drawing or attempting to draw a pension and has neither sought nor experienced the denial of any claimed benefit—but is instead seeking redress for a loss to the DLA Plan caused by the alleged breach of defendants' fiduciary duties. He does not seek an individual or otherwise separate remedy. Falcone's claim, then, does not appear to fit within the categorical context in which the Chief Justice warned against the possible election of recoveries. *See, e.g., Burns v. Orthotek Ink. Employees Pension Plan and Trust*, No. 08-00190, 2009 WL 631245, at *4-5 (N.D. Ind. March 11, 2009) (finding, where widow was denied survivor benefits and brought suit under both Sections

**United States District Court**
For the Northern District of California

502(a)(1)(B) and (a)(2), that the latter was not cognizable where the former capably provided the remedy sought).

V. CONCLUSION

Accepting all Falcone's factual claims and making all reasonable inferences in his favor, Falcone has adequately pleaded a claim for a Section 502(a)(2) breach of fiduciary duty against all named defendants. Defendants' motion to dismiss for failure to state a claim for relief therefore must be denied.

IT IS SO ORDERED.

Dated: 06/07/2010

RICHARD SEEBORG
UNITED STATES DISTRICT JUDGE